**H. J. JEFFRIES TRUCK LINE, a Corporation, and Transport Insurance Company, a Corporation, Petitioners,**

v.

**Lowell Dean GRISHAM and State Industrial Court, Respondents.**

No. 40373.

Supreme Court of Oklahoma.

Nov. 10, 1964.

Rehearing Denied Dec. 22, 1964.

Ross, Holtzendorff & Hurd, Jay R. Bond, Oklahoma City, for petitioners.

Wheeler, Parsons, Wheeler, Hampton & Kessler, Oklahoma City, Charles R. Nesbitt, Atty. Gen., for respondents.

JACKSON, Justice.

The trial tribunal's order presented here for review allows claimant continuing compensation during the period of temporary total disability from coronary occlusion found to have been "precipitated by physical stress and strain" arising out of his employment.

Claimant, a truck driver, was in the continuous service of the employer from August 11, 1961, to November 3, 1961. While on a layover he was dispatched Saturday morning, October 28, to drive a 1955 model Mack semi truck-trailer from employer's Oklahoma City terminal to Ozark, Arkansas. His instructions were to report there for work at 7:00 A.M. the following Monday (Oct. 30). After receiving this assignment he assisted in loading a gin pole truck on the back of his trailer. He left

Oklahoma City at 9:00 P.M., on Sunday, October 29, and reached Ozark at about 4:30 Monday morning. Before reporting for work at 7:00 A.M., he lay down in the cab, slept for about thirty minutes and then ate breakfast. Upon arriving at his destination—a place some twelve to fourteen miles outside Ozark—he unhooked his trailer, helped to unload it, fixed a flat tire on another trailer and spent the rest of the day assisting some ten or eleven other drivers in loading heavy equipment with the use of a "hook and winch line." A part of this work did require considerable exertion. It took until 7:30 that evening (Monday, Oct. 30) to complete the job. He then returned to Ozark, procured a weight ticket for his truck, ate dinner and checked in at a local hotel where he spent the night. Going to sleep at 9:30 that evening, he got up at 5 o'clock the following morning (Tuesday, Oct. 31) and left Ozark at 7:00 A.M., with a load destined for Fort Smith, Arkansas. At Fort Smith he helped unload his truck and load another one which he then drove back to the Ozark terminal, arriving there at 2:30 or 3:00 o'clock in the afternoon. It was about 4:30 that afternoon when he finished. His work consisted of loading his truck "and one or two more." After that he went to Ozark, procured another weight ticket for his truck and then tried to repair his lights until about 7:00 P.M. After eating supper he went to sleep at 9:00 o'clock that evening (Tuesday, Oct. 31). On Wednesday, November 1, he got up at 5:30 in the morning and left Ozark at 7:00 o'clock arriving in Oklahoma City at about 4:30 that afternoon. Reaching his home in Oklahoma City at about 5:30 in the evening, he went to sleep at 8:30 P.M., returned to the terminal at 6:00 o'clock the following morning (Thursday, Nov. 2), and was dispatched to Fruitland, New Mexico, with a "pole trailer" which was "difficult to pull" because he was unaccustomed to driving it and "you had to watch your trailer a lot more, every turn you made and every time you passed another truck you had to watch it awful close." He left the terminal in Oklahoma City at 9:00 o'clock Thursday morning. Stopping only once long enough to eat lunch he drove that day to Vega, Texas, reaching that town at 7:30 in the evening. There he stopped for the night after noticing that the lights on the "back of the trailer" were not working. He got under the vehicle in an effort to locate a "naked wire" which was causing the short. It took him about one and one-half or two hours to complete the repair. During this time he remained beneath the vehicle, crawling in darkness around the narrow space, 15 to 18 inches from the ground. This required considerable exertion. After getting a New Mexico permit for his load he went to bed about 10:30 that evening. The following morning (Friday, Nov. 3) he got up at 4:30 A.M., and left Vega at 5:00 o'clock for Fruitland, New Mexico. Around noon he "got short of breath" and "started getting dizzy." Around 1:00 o'clock in the afternoon he reported this to the employer by telephone and was instructed to "go on into the next town and see * * * a doctor." He reached Moriarty, a town about 22 miles away, whence he was taken by highway patrolman to a hospital in Albuquerque. It stands admitted that claimant suffered an episode of coronary occlusion. So far as the record discloses, this was his second heart attack. The preceding one occurred in June, 1960, and was diagnosed as coronary thrombosis.

The principal issue formed in the proceedings before the trial tribunal was that of a causal relation, if any, between the cardiac episode and the series of antecedent employment activities to which claimant sought to attribute it.

The trial court found the injury was accidental and consisted "of coronary occlusion precipitated by physical stress and strain." The order allowing compensation was affirmed by the trial tribunal en banc.

Employer asserts, inter alia, that the trial tribunal's finding of an accidental injury is entirely unsupported by any evidence "of a physical strain causing claimant's heart attack."

Disability or death attributable to coronary occlusion, thrombosis or myocardial infarction is compensable if antecedent strain arising out of and in the course of employment is either the sole or a contributing cause of the pathology. Young v. Neely, Okl., 353 P.2d 111; Sunray Mid-Continent Oil Company v. Hoover, Okl., 360 P.2d 710, 712. Even though claimant may have suffered from pre-existing disease or infirmity, which constitutes a predisposing cause, an internal injury of a sudden, unusual and unexpected nature may nevertheless be accidental in character, although its external cause is attributable to ordinary work performed in a normal manner and without any untoward incident connected therewith. Kelley v. Enid Terminal Elevators, Okl., 372 P.2d 589; Ben Hur Coal Company v. Orum, Okl., 366 P.2d 919. An accidental injury within the meaning of the Workmen's Compensation Act need not be attributable to one particular event, but may arise progressively from the cumulative effect of a series of exertion episodes. See Macklanburg-Duncan Co. v. Edwards, Okl., 311 P.2d 250; Acme Material Company v. Wheeler, Okl., 278 P.2d 234; Calhoun Const. Co. v. Sexton, Okl., 288 P.2d 705, and G. T. Harvey Company v. Steele, Okl., 347 P.2d 802, 804.

According to Dr. S, claimant's expert witness, "there can be little doubt" but that claimant's coronary attack was precipitated by "prolonged working period," "stress of long travel," "protracted driving" and lack of (adequate) sleep" between October 29, and November 3. These factors, Dr. S related, coupled together operated collectively to produce "a physical excess" and "it would be awful hard" to isolate any single effort or "strained activity" as being the critical "stressful phenomenon."

As we view the record, there is ample evidence here to show by detailed lay testimony the nature of work to which claimant's injury was sought to be ascribed and to demonstrate by the expert opinion of Dr. S, that the "physical excess" occasioned by such employment activities as shown was sufficient in degree to, and did in fact, produce the strain which culminated in coronary occlusion. Claimant therefore met the quantum of proof necessary to establish the factum of an accidental injury by strain. Black, Sivalls & Bryson, Inc., v. Coley, Okl., 367 P.2d 1017, 1020, and Farmers Cooperative Ass'n v. Madden, Okl., 356 P.2d 741, 744.

Employer submits the evidence here "is not that the physical effort strained his heart, it is only that it made claimant tired." We are urged that "fatigue" from working will not support the factum of an accidental injury by strain or exertion. By dictionary definition "fatigue" means a state of exhaustion from labor or exertion. An accident, within the meaning of the Workmen's Compensation Act, is established by showing that there exists a causal relation between work-connected strain or exertion and the injury. Anderson-Prichard Oil Co., v. Floyd, Okl., 340 P.2d 943, 945; Farmers Cooperative Ass'n v. Madden, supra. Dr. S explained that claimant had been weakened or fatigued by the cumulative effect of his employment activities and because of this all ordinary efforts of labor, including the driving, became afterwards "excessive" or "stressful" to him. The element of fatigue from prior work did, according to Dr. S make claimant more vulnerable to an episode of coronary occlusion from less intense strains of ordinary labor.

There is no analogy here to the rule which governs infectious disease. Internal injury produced by work-connected strain or exertion is accidental in character. Disability caused by an internal bacterial disease contracted at work or while in a condition weakened by work is not compensable. Barnett v. Interstate Oil Pipeline Company, Okl., 294 P.2d 553, 554; Cardwell Mfg. Co. v. Thomas, 192 Okl. 143, 134 P.2d 562, 563; Black, Sivalls & Bryson, Inc. v. Silvey et al., 184 Okl. 176, 86 P.2d 327.

Neither are we persuaded by employer's contention that the testimony of Dr. S lacks probative value because based

on facts contrary to other evidence in the case. Employer's argument presupposes that the law requires a physician to ascribe the injury to an effort of strenuous labor which has been shown to be unusual for the particular employment in which claimant engages. This, of course, is a misconception. The impact of a strain develops from an interplay of a multitude of variable factors which depend largely on the individual reaction of a given human organism to the physical forces in action. Strain or overexertion relates exclusively to the person injured. As applied to that person, its principal ingredient is unusual effect rather than unusual cause. If, because of some pre-existing underlying weakness, an employee reaches a breaking point under the stress of ordinary work, for that individual the break is nonetheless the result of overexertion. It is so because the individual's organism did give way under its force. The break is deemed the accident—the fortuitous and unexpected event. This point may be reached through the cumulative effect of each day's strain. Separately one day's strain may be slight, but when added to the strains which have preceded, it becomes a destructive force. G. T. Harvey Company v. Steele, supra; Black, Sivalls & Bryson, Inc. v. Coley, supra. The law prescribes no standard of health or quantum of endurance for a workman. If his physical structure gives way under the stress of his usual labor which aggravates or accelerates a latent predisposing condition, the injured workman is nevertheless entitled to compensation. Truck & Trailer Sales and Service v. Davis, Okl., 372 P.2d 612; B & W Truck Service v. Cline, Okl., 368 P.2d 499.

■ Claimant's lay testimony did not need to show, and his physician assume, that the activities, to which he sought to attribute the cardiac injury, were unusual for a truck driver. Kelley v. Enid Terminal Elevators, supra. It was sufficient to show factually and medically that there was a causal relation between the heart attack and the sum total of claimant's antecedent efforts of labor which *for him* must be deemed "unusual" or stressful.

In many of our former decisions an "unusual strain" preceded the heart attack. In other decisions the employee was engaged in normal activities which were strenuous by their very nature. Unusual exertion producing an "unusual strain" is not a statutory or legal prerequisite to recovery in heart cases. Whether a heart attack is provoked by employee's labor or is a result of natural causes is a question of fact, and before recovery for a heart attack is allowed it must be apparent to the rational mind, upon consideration of all the circumstances, that there is a causal connection between the labor and the resulting injury. The significance of proof of "unusual exertion" preceding a heart attack is to show a causal connection between the labor and the heart attack and to overcome the possibility that the heart attack may have been the result of natural causes.

■ As we view the expert evidence in the record there is no material variance between the facts assumed by Dr. S and those assumed by Dr. R, employer's expert witness. Moreover, it is not absolutely essential that the history assumed by the expert witness include all the facts the evidence tends to prove. It is sufficient if the history substantially incorporate such facts as the proof of the party fairly tends to establish and as are consistent therewith. Black, Sivalls & Bryson, Inc., v. Story, Okl., 378 P.2d 764, 767. We find no fatal variance between the facts assumed by Dr. S and the undisputed facts adduced by the evidence. See Byers v. Creeco Mills & Elevator Company, Okl., 388 P.2d 476, 478.

Lastly, employer contends that claimant's employment was procured by fraudulent misrepresentation as to his health and was void from its inception. This matter was raised both in employer's answer and by its evidence. The trial tribunal made no finding thereon apparently on the assumption that an employee's misrepresentation as to his health does not constitute a

statutory defense to a claim for benefits under the Workmen's Compensation Act.

The evidence discloses without substantial dispute that when seeking employment claimant gave a negative answer to the question, "Do you have any physical defects?" and denied having a "heart disease" when questioned by the nurse preliminary to his pre-employment examination. At the time these answers were given claimant was still under medical care for the condition from his first heart attack and was taking anti-coagulant remedy prescribed by his physician. He explained in his testimony that he did not know at that time his condition amounted to a "heart disease;" had they asked him if he ever had any heart trouble he would have answered in the affirmative.

 Generally, where employment is induced by false and fraudulent representations not going to the factum of the contract, the contract is merely voidable and not void. Therefore, the relation of employer and employee *does exist* in contemplation of law, although the misrepresentation may form a tenable ground for the rescission of the contract at the option of the employer. As applied to actions under the Federal Employers' Liability Act, recovery was generally allowed for injuries sustained during such voidable employment unless there was a causal connection between the injury and the misrepresentation. 58 Am.Jur. Sec. 335, p. 809; 56 C.J.S. Master and Servant § 180 e, p. 872; 71 C.J. 435; Annotation, 136 A.L.R. 1124. However, this rule has wholly failed to gain any detectable recognition in the decisional law construing workmen's compensation statutes, whereunder "[a]n employee is entitled to compensation although he secured his employment through false representation in writing * * *, since a contract of employment secured by false representations is not void, but voidable, at the option of the employer." 99 C.J.S. Workmen's Compensation § 61, p. 266.

Our independent research discloses that false representation in inducing employment, when not going to the factum of employment, was expressly held unavailable as a defense under the New York and Louisiana Compensation Statutes. Kenny v. Union Ry. Co., 166 App.Div. 497, 152 N.Y.S. 117; Plick v. Toye Bros. Auto & Taxicab Co., 13 La.App. 525, 127 So. 59. In the case first cited the court pointed out that the defense did not fall into any class of statutory "exceptions" from liability and under the law it did not matter "whether the employment was under a contract concededly valid as to both parties, or under a contract voidable at the election of the employer * * *."

Employer relies on the decision of the United States Supreme Court in Minneapolis, St. Paul & S. Ste. Marie R. Co. v. Rock, 279 U.S. 410, 49 S.Ct. 363, 73 L.Ed 766. The cited case was decided under the Federal Employers' Liability Act. It "involved the railroad's liability for the negligent injury of one Joe Rock, who had obtained his employment by a whole series of misrepresentations." Rock had originally applied for a job in his own name and had been rejected as physically unfit. Several days later he reapplied for the job representing himself to be "John Rock"—a name he assumed to conceal the fact that he had previously been refused employment. He next arranged for a healthy individual to pose as "John Rock" at railroad's pre-employment physical examination. The railroad hired Joe Rock on the erroneous assumption that he was "John Rock" and had the physical fitness of the individual substituted at the physical examination. The Supreme Court held that Rock could not recover. The so-called "Rock doctrine" which evolved from that decision has been considerably circumscribed by that Court's most recent pronouncement in Still v. Norfolk & Western Railway Co., 368 U.S. 35, 82 S.Ct. 148, 7 L.Ed.2d 103. In the Still case the Court held that "the Rock case, properly interpreted, lays down no general rule at all" and "that Rock must be limited to its precise facts." The court's

decision appears to rest on the conclusion that:

"To facilitate this congressional policy, the terms 'employed' and 'employee' as used in the Act must, in all cases not involving the precise kind of fraud involved in Rock, be interpreted according to their ordinary meaning, and the status of employees who become such through other kinds of fraud, although possibly subject to termination through rescission of contract of employment, must be recognized for purposes of suits under the Act." (82 S.Ct. 154)

Our Workmen's Compensation Act is silent on the effect of employee's false representation which does not amount to fraud in esse contractus and render the employment contract absolutely void. In the decisional law of other jurisdictions we find but one court of last resort which accorded recognition to such non-statutory defense. Martin Company v. Carpenter, Fla., 132 So.2d 400, 406. In the absence of a clear legislative intent, we do not feel at liberty to impose any limitations, forfeitures or abridgements upon the employee's statutory right to recover compensation. We are therefore constrained to hold that facts of misrepresentation relied upon herein do not operate in law to alter claimant's status as an employee for the purpose of a claim under our Workmen's Compensation Act.

The challenged finding rests on competent evidence and the proceeding is free from errors of law.

Award sustained.

BLACKBIRD, C. J., and DAVISON, JOHNSON and WILLIAMS, JJ., concur.

HALLEY, V. C. J., and IRWIN and BERRY, JJ., dissent.

BERRY, Justice (dissenting).

The nature and effect of the majority opinion compel this statement of my views. The present opinion recognizes that the claimant fraudulently concealed existence of an existing physical disability, both at the time of application for employment and at the time of medical examination. The issue of fraud in procurement of employment was raised by respondents although neither the trial judge nor the Industrial Court en banc made any finding thereon.

In affirming the order awarding compensation, the Court recognizes that under F.E.L.A. cases, where the issue has been raised, injuries sustained within the course of a "voidable" employment generally have been held compensable, unless there is a causal connection between the injury and the fraudulent misrepresentation. See text citations in the majority opinion. The conclusion in the present case is predicated upon the declaration that, absent a clear legislative intent, this Court may not impose limitation, forfeiture or abridgment upon an employee's right to compensation. The reasoning is that our Workmen's Compensation Act is silent as to the effect of fraud not amounting to fraud "in esse contractus", which would render the contract of employment absolutely void. From this is derived the conclusion that the fraud apparent in the present contract of employment did not render the contract void, and thus provided nothing other than a ground for rescission at the employer's option.

The far-reaching and regrettable results of this holding are most apparent: (1) judicial stamp of approval is placed upon active fraud in procuring employment; (2) hereafter different rules of law are to be applied by this Court in determining the ultimate result. In ordinary civil cases a wrong-doer will not be permitted to profit from his fraud, but in Workmen's Compensation cases the active fraud by which an employee is induced to enter a contract of employment not only is judicially condoned but the employer is deprived of legal defense thereto.

It is my opinion the general provisions of our code provide grounds which wholly preclude enforcement of compensation benefits under a contract of employment

procured by active, fraudulent misrepresentations.

85 O.S.1961, Sec. 105 provides:

"If for the purpose of obtaining any benefit or payment under the provisions of this act, either for himself or any other person, any person wilfully makes a false statement or representation, he shall be guilty of a misdemeanor. Laws 1915, ch. 246, art. 5, § 6."

The claimant fraudulently misrepresented his physical condition. By reason of his fraud the employer was misled and claimant was enabled to procure employment. The statute, 15 O.S.1961, Sec. 53 provides that apparent consent to a contract cannot be free when obtained through fraud. Sec. 54 provides that consent is deemed obtained through fraud when consent would not have been given had such cause not existed. Sec. 58 provides:

"Actual fraud, within the meaning of this chapter, consists in any of the following acts, committed by a party to the contract, or with his connivance, with intent to deceive another party thereto, or to induce him to enter into the contract:

"1. The suggestion, as a fact, of that which is not true, by one who does not believe it to be true.

"2. The positive assertion in a manner not warranted by the information of the person making it, of that which is not true, though he believe it to be true.

"3. The suppression of that which is true, by one having knowledge or belief of the fact.

"4. A promise made without any intention of performing it; or,

"5. Any other act fitted to deceive."

Sec. 151 declares that both public and private contracts are to be interpreted by the same rules.

We have held innumerable times that the laws in force when a contract is made are as fully a part of the contract as though incorporated therein. In Knight v. Clinkscales, 51 Okl. 508, 152 P. 133, Syllabus 2 states:

"2. The laws which exist at the time and place of making a contract, and at the place where it is to be performed, effecting its validity and construction, enter into and form a part of it."

By reason of the statutes above mentioned the respondents' consent or agreement to employ claimant was not a free consent because procured by fraud. This consent or acceptance of claimant for employment would not have been given except for the fraud practiced upon respondents and the examining physicians. That claimant's conduct when seeking employment constituted actual fraud is reflected by the evidence measured under Sec. 58, supra.

The further statute, 15 O.S.1961, Sec. 211 provides:

"Those contracts are unlawful which are:

"1. Contrary to an express provision of law.

"2. Contrary to the policy of express law, though not expressly prohibited; or,

"3. Otherwise contrary to good morals."

The majority opinion fails to recognize the requirements of the statutes above mentioned and their applicability to the present situation. In my view, the positive requirements of these statutes must be applied in order to determine the rights of the parties. The Workmen's Compensation Act declares it a misdemeanor for any person to make false representations or statements for the purpose of obtaining any benefit under the Act. The fraudulent statements by claimant indisputably were made for the purpose of procuring employment in an occupation claimant knew was defined as hazardous and covered employment under the provisions of the Act.

It is unnecessary to resort to applicable Motor Carrier Safety Regulations of the Interstate Commerce Commission which

would have made claimant unemployable as an interstate operator or to our own public safety regulations (47 O.S.1961, Secs. 6–103 et seq.) which would have precluded claimant's licensure as a chauffeur. The general code provisions governing all contracts entered into within this State fully establish the illegality of the contract of employment herein. There was a direct and causal relation between the fraudulent misrepresentation and the injury for which the State Industrial Court awarded claimant compensation. The provisions of the statutes must be read in conjunction with the Workmen's Compensation Act and, being a part of the Act, it follows that the failure to enumerate fraud as a defense to a claim for compensation cannot be construed or interpreted as meaning that active fraud is not a defense to a claim for compensation. Neither, in view of the statutes, can it reasonably be said that the Court is imposing an additional limitation upon an employee's right to compensation.

Within my opinion and in an effort to avoid the absurd and dangerous consequences to accrue in the future from the majority opinion, this Court should adopt the rule stated in Martin Company v. Carpenter, (Fla.), 132 So.2d 400:

"We therefore adopt the rule that a false representation as to physical condition or health made by an employee in procuring employment will preclude the benefits of the Workmen's Compensation Act for an otherwise compensable injury if there is shown to be a causal relationship between the injury and the false representation and if it is also shown that (1) the employee knew the representation to be false, (2) the employer relied upon the false representation and (3) such reliance resulted in consequent injury to the employer."

Approval and continued application of the majority rule will result only in the grossest abuses in the future. I dissent.

Rehearing denied; IRWIN and BERRY, JJ., dissenting.